IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

BRYAN ANTHONY DOUGLAS

      Plaintiff,                       No. CIV S-09-3411 KJM CKD

    vs.

M. MARTEL, et al.                      ORDER AND

      Defendants.             FINDINGS AND RECOMMENDATIONS

_____/

        Plaintiff is a state prisoner proceeding pro se and in forma pauperis with an action under 42 U.S.C. § 1983. He alleges that after his transfer to Mule Creek State Prison (MCSP), doctors there were deliberately indifferent to a serious medical need when they denied his request for a special diet or food substitutes for his allergies to nuts and fish. He also alleges that on one occasion at MCSP, he accidentally ingested a nut product provided to him by the prison, an incident for which he seeks damages. Defendants do not deny that plaintiff is allergic to nuts and fish, but they deny that they were required to give plaintiff a special diet or food substitutes. They also assert that plaintiff has never suffered any compensable injury as a result of their refusal to make special accommodation for his food allergies. On those bases, defendants have moved for summary judgment.

/////

I.  Standard of Review for Summary Judgment

Summary judgment is appropriate when the movant demonstrates that there exists "no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).

> Under summary judgment practice, the moving party always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact.

Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56(c)). Summary judgment should be entered, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. See id. at 322. "[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." Id. In such a circumstance, summary judgment should be granted "so long as whatever is before the district court demonstrates that the standard for entry of summary judgment, as set forth in Rule 56(c), is satisfied." Id. at 323.

If the moving party meets its initial responsibility, the burden then shifts to the opposing party to establish that a genuine issue as to any material fact actually does exist. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). In attempting to establish the existence of this factual dispute, the opposing party may not rely upon the allegations or denials of its pleadings but is required to tender evidence of specific facts in the form of affidavits, and/or admissible discovery material, in support of its contention that the dispute exists. See Fed. R. Civ. P. 56(e); Matsushita, 475 U.S. at 586 n.11. The opposing party must demonstrate that the fact in contention is material, i.e., a fact that might affect the outcome of the suit under the governing law. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir.

1987). The opposing party must also demonstrate that the dispute is genuine, i.e., that the evidence is such that a reasonable jury could return a verdict for the nonmoving party, see Wool v. Tandem Computers, Inc., 818 F.2d 1433, 1436 (9th Cir. 1987).

To establish the existence of a factual dispute, the opposing party need not establish a material issue of fact conclusively in its favor. It is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." T.W. Elec. Serv., 809 F.2d at 631. Thus, the "purpose of summary judgment is to 'pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial.'" Matsushita, 475 U.S. at 587 (quoting Fed. R. Civ. P. 56(e) advisory committee's note on 1963 amendments).

In resolving the summary judgment motion, the court examines the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any. Fed. R. Civ. P. 56(c). The evidence of the opposing party is to be believed. See Anderson, 477 U.S. at 255. All reasonable inferences that may be drawn from the facts placed before the court must be drawn in favor of the opposing party. See Matsushita, 475 U.S. at 587. Nevertheless, inferences are not drawn out of the air, and it is the opposing party's obligation to produce a factual predicate from which the inference may be drawn. See Richards v. Nielsen Freight Lines, 602 F. Supp. 1224, 1244-45 (E.D. Cal. 1985), aff'd, 810 F.2d 898, 902 (9th Cir. 1987). Finally, to demonstrate a genuine issue, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts . . . . Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" Matsushita, 475 U.S. at 587 (citation omitted).

II.   Factual and Procedural Background

Plaintiff has been allergic to nuts and fish since his youth. See Defendants' Undisputed Fact (DUF) 2. In his deposition, he stated that if he ingests something to which he is allergic, "[t]he first symptom is the tingling in the throat... usually followed by excessive

salivation. At that point I try to expel whatever it is that I ate so I can minimize the effect." Plaintiff's Deposition at 11 (Docket No. 30-5).[1] If the symptoms worsen, he uses his inhaler or takes Benadryl. In severe cases, the allergic reaction can abate or cut off his breathing, for which he needs medical attention. Id. at 11-12. He also testified to one occasion at San Quentin State Prison in January 2009, when he unknowingly ingested a nut product and experienced hives, nausea and rapid heartbeat. Id. at 14-18. The incident ended with his being taken to a hospital in an ambulance, where his condition was stabilized.[2] Id. at 20-22.

Plaintiff was transferred to MCSP on May 1, 2009. DUF 10. It appears that the first time he discussed his allergies and other medical conditions with medical staff at MCSP was on May 28, with Dr. Soltanian-Zadeh, a defendant in this case. DUF 11. At this meeting, plaintiff requested a special diet. See Defendants' Ex. 1 at 3 (Docket No. 30-4). Dr. Soltanian-Zadeh asserts that he does not have authority within the prison to provide a special diet to an inmate without the approval of the Chief Physician and Surgeon and Chief Medical Executive. See Aff. of Soltanain-Zadeh, M.D., ¶ 7 (Docket No. 30-7). At the time plaintiff requested a special diet, the Chief Physician and Surgeon was Dr. Smith, and the Chief Medical Executive was Dr. Healey. Id. at ¶ 8. Dr. Heatley is also a defendant in this case.

Dr. Soltanian-Zadeh states he counseled plaintiff about avoiding allergens in his daily diet. The doctor noted two conversations with kitchen staff after plaintiff's request. First, he spoke with "Victor" in the kitchen area, who, according to the doctor's records, "came over and went over the food menu" while plaintiff was still with Dr. Soltanian-Zadeh. Defendants' Ex. 1 at 5. Victor explained to the doctor that there may be one fish meal per week and two or three breakfasts containing nuts per week. Id. Dr. Soltanian-Zadeh wrote that "if [plaintiff]

---

[1] The court refers to the page numbers assigned by the court's CM/ECF system.

[2] Plaintiff also testified that a physician at the emergency room opined that the rapid heartbeat was caused by a shot of Epinephrine that a prison nurse had administered. Id. at 21. Plaintiff, a former emergency medical technician with paramedic training, disagreed with that opinion. Id. at 19, 21.

4

avoids these, he will still get enough calories/prot[ein]/etc per wk, since total daily calories are [approximately] 2900." Id.  He wrote that he also suggested a Carnation drink as a breakfast supplement "but was denied by Dr. Smith." Id.

The next day, May 29, 2009, Dr. Soltanian-Zadeh wrote that he "was just informed by Victor... that they only use vegetable oil for cooking." Id. at 6.  Victor also told the doctor that "there may be occasional use of nuts on cakes for dessert in which [case] they post a sign informing the inmates that the food has nuts in it." Id.

For his part, plaintiff has submitted, under penalty of perjury, a list of the days he was served a meal with fish or nut products over a period of several months.  See Opp'n. at 82-86 (Docket No. 32, Ex. 11).  The list shows that nut products, particularly peanut butter and granola bars, were served nearly every day, at least once a day, which is far more frequently than the "two to three breakfasts" to which Dr Soltanian-Zadeh has attested.  Fish, on the other hand, appears to have been served infrequently, far less often than once a week.

Dr. Soltanian-Zadeh submits a sworn declaration describing his efforts to inform plaintiff of the content of the prison diet, as well as the following:

> On May 28, 2008 [sic], I also counseled Plaintiff on how to avoid his allergens.  I advised him that it was his responsibility to avoid his allergens by not consuming foods with nuts or fish in them.  If he was unsure about the contents of a food item, it was his responsibility to ask questions concerning that item and was not to eat it if he was unsure.  I also recommended that he check the posted menus and ask questions about the menu in advance if he was unsure if a nut or fish product was included.  I also counseled him concerning what to do if he accidentally ingested a fish or a nut product.  I advised him that should he experience any symptoms related to accidental ingestion of his allergens, he must immediately present to the nearest medical clinic for treatment.

Aff. of Soltanian-Zadeh, M.D., ¶ 11.  Plaintiff directly disputes this account of his meeting with the doctor, contending that he was "never trained or educated by Soltanian in the avoidance of allergens." Plaintiff's Statement of Undisputed Facts at 114 (Docket No. 32).  Dr. Soltanian-Zadeh states that, in light of the prison medical staff's immediate access to medications necessary

5

to combat an allergic reaction, "I was confident that should Douglas accidentally ingest a peanut product, he would receive appropriate, timely treatment." Id. at ¶ 13.

On the same day he conferred with plaintiff, Dr. Soltanain-Zadeh informed the Chief Medical Executive at MCSP, Dr. Heatley, that an inmate with allergies to nuts and fish had requested a special diet. Aff. of Heatley, M.D., ¶ 2 (Docket No. 30-6). Dr. Heatley states that he consulted "Chapter 20" of the relevant section of the California Department of Corrections and Rehabilitation's (CDCR) written health care policies "in an effort to determine the appropriate action to take in handling a situation where an inmate has food allergies." Id. at ¶ 3. He states that his research found the following:

> "Medical diets" are only offered for inmates who receive renal dialysis and inmates who need gluten free diets. Section VIII [sic]: "The PCP shall evaluate inmate-patients who request a special diet due to claimed food allergy. If the Primary Care Physician (PCP) determines the inmate-patient has a food allergy, the PCP will determine if the allergy can be appropriately managed by educating and training the inmate to avoid the identified food, or if a Chrono ordering a food substitute is required." It is the inmate's responsibility to avoid the foods he is allergic to, and medical staff's responsibility to provide food substitutions or supplements if such substitutions or supplements are medically necessary.

Id.

Dr. Heatley also states that he researched the nutritional content of the food served at MCSP "to determine whether Douglas would receive appropriate nutrition by avoiding fish and nuts." Id. at ¶ 5. He found that all inmates receive CDCR's "Heart Healthy Diet," which contains "a caloric and protein quantity greater than that which is needed for most active adult males." Id. He found that the purpose of providing more calories and protein than necessary is to allow inmates some choice in what they eat. "If there are foods that they do not like, they can avoid those foods and the meal will still provide the inmate ample calories and nutrition." Id. The average number of calories provided per day was 2,768, and the average protein intake was 101 grams. Id.

////

Dr. Heatley took into account plaintiff's weight in deciding whether to order a special diet. When plaintiff requested the diet, he was 5'8" and weighed 230 pounds, with a body mass index of 35. Id. at ¶ 7. Dr. Soltanian-Zadeh diagnosed plaintiff as "severely obese," and Dr. Heatley appears to have agreed. Aff. of Soltanian-Zadeh at ¶ 5; Aff. of Heatley at ¶ 7. Dr. Heatley states that "[f]or Douglas to maintain this weight, he would need approximately 2300 calories a day and 83 grams of protein." Aff. of Heatley at ¶ 7. However, "'good health' would require Douglas to lose weight," which would mean a maximum of approximately 1,909 calories and 61 grams of protein per day. Id. Dr. Heatley submits that, after considering plaintiff's specific condition, including plaintiff's medical history,

> I concluded that by eliminating nut and fish products from his "Heart Healthy" diet, Douglas would still be provided with sufficient nutrition. On average, if he chose to eat all of the foods except the foods he was allergic to, he would receive an average daily intake of 2580 calories and 93 grams of protein, more than the amount of calories and grams of protein needed to maintain his obese weight, or if he chose to do so, to reduce his caloric and protein intake in an effort to lose weight for better health. Consuming more calories than those needed to maintain his weight would not be beneficial to his health, and may, in fact, be detrimental.

Id. at ¶ 8.

Having decided against a special diet for plaintiff, Dr. Heatley "created a medical response plan for Douglas in case of accidental exposure to fish and/or nuts...." Id. at ¶ 13. The plan essentially required ensuring appropriate medications were available at the MCSP medical clinics and in an emergency response kit. Id. Dr. Heatley states that he and Dr. Soltanian-Zadeh considered providing plaintiff with an epinephrine pen "to have on his person in case of accidental exposure." Id. They decided against it because plaintiff had shown that he had not been compliant in taking other medications, and "we believed that his medical needs would be better addressed if medical staff administered the medications he needed." Id.

On May 30, 2009, two days after his consultation with Dr. Soltanian-Heatley, plaintiff ingested a small amount of peanut butter and jelly ice cream. He testified in his

7

deposition that he mistakenly thought the ice cream was chocolate. See Depo. at 23. He sensed some tingling on his tongue and immediately sought the attention of medical staff. Id. at 23-24. Within about ten minutes, medical staff administered a shot of Benadryl, and plaintiff experienced no further symptoms. Id. at 24. On another occasion, he accidentally put a candied nut in his mouth but spit it out before he swallowed it. Id. at 25. He did not experience any allergic reaction, but he went to the prison clinic and requested Benadryl, "just to err on the side of caution." Id. Plaintiff did not include this second incident as a basis for liability in his complaint.

Plaintiff filed this lawsuit on December 8, 2009. The court screened the complaint under 28 U.S.C. § 1915A and ordered that service was appropriate for Drs. Soltanian-Zadeh and Heatley. During plaintiff's deposition,[3] defense counsel asked plaintiff to summarize "[y]our injuries as a result of not being given a special diet[.]" Id. at 26. They were: (1) "fear that something could be given to you that you don't recognize and you ingest it, and that could be possibly life-threatening;" (2) constant hunger and headaches as a result of hunger; and (3) the accidental ingestion of peanut butter and jelly ice cream on May 30, 2009. Id. at 26-27. Plaintiff seeks compensatory and punitive damages and an injunction requiring MCSP to serve him a special diet not containing nuts or fish products.

III.   Analysis

The gravamen of plaintiff's complaint is that Drs. Soltanian-Zadeh and Heatley were deliberately indifferent to his serious medical needs by not ordering a special diet in response to his food allergy. In Estelle v. Gamble, 429 U.S. 97, 106 (1976), the Supreme Court held that inadequate medical care did not constitute cruel and unusual punishment cognizable

---

[3] Defendants filed a motion to take plaintiff's deposition by video-conference. That request is now moot. Plaintiff filed a motion to extend discovery. Although the court has not ruled on that motion, it too is now moot. Plaintiff has produced 100 pages of documents in support of his opposition, and there is no indication that he was hindered in conducting any discovery between the time he filed his motion and the time the summary judgment motion was filed.

under 42 U.S.C. § 1983 unless the mistreatment rose to the level of "deliberate indifference to serious medical needs." From this baseline standard, the Ninth Circuit has developed a two-part test for deliberate indifference:

> First, the plaintiff must show a serious medical need by demonstrating that failure to treat a prisoner's condition could result in further significant injury or the 'unnecessary and wanton infliction of pain. Second, the plaintiff must show the defendant's response to the need was deliberately indifferent. This second prong – defendant's response to the need was deliberately indifferent – is satisfied by showing (a) a purposeful act or failure to respond to a prisoner's pain or possible medical need and (b) harm caused by the indifference. Indifference may appear when prison officials deny, delay or intentionally interfere with medical treatment, or it may be shown by the way in which prison physicians provide medical care.

Jett v. Penner, 439 F.3d 1091, 1096 (9th Cir. 2006) (internal citations & quotations omitted); see also McGuckin v. Smith, 974 F.2d 1050, 1060 (9th Cir.1992), overruled in part on other grounds, WMX Technologies, Inc. v. Miller, 104 F.3d 1133, 1136 (9th Cir.1997). There is no Eighth Amendment violation if any delay in treatment is not harmful. Shapely v. Nevada Bd. of State Prison Com'rs., 766 F.2d 404, 407 (9th Cir. 1985). However, unnecessary continuation of pain may constitute the "harm" necessary to establish an Eighth Amendment violation from delay in providing medical care. McGuckin, 974 F.2d at 1062.

A medical need is serious if failure to treat the condition could cause further significant injury or the unnecessary and wanton infliction of pain. McGuckin, 974 F.2d at 1059.

> The existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individual's daily activities; or the existence of chronic and substantial pain are examples of indications that a prisoner has a "serious" need for medical treatment.

Id. at 1060.

Finally, a showing of merely inadvertent or even negligent medical care is not enough to establish a constitutional violation. Estelle, 429 U.S. at 105-06; Frost v. Agnos, 152

F.3d 1124, 1130 (9th Cir.1998).  A difference of opinion about the proper course of treatment is not deliberate indifference, nor does a dispute between a prisoner and prison officials over the necessity for or extent of medical treatment amount to a constitutional violation.  See, e.g., Toguchi v. Chung, 391 F.3d 1051, 1058 (9th Cir.  2004); Sanchez v. Vild, 891 F.2d 240, 242 (9th Cir. 1989).

   Plaintiff's complaint that he suffered from "constant hunger" and headaches colors his deliberate indifference claim as one for the wanton or unnecessary deprivation of food.  Food is unquestionably a basic human necessity, but "[t]he Eighth Amendment requires only that prisoners receive food that is adequate to maintain their health; it need not be tasty or aesthetically pleasing."  LeMaire v. Maass, 12 F.3d 1444, 1456 (9th Cir. 1993).

   The court finds no material evidence that the defendants did anything to endanger plaintiff's health in denying him a special diet, nor were they deliberately indifferent to his food allergy in doing so.  Plaintiff was able to maintain his health with the "Heart Healthy" diet provided by CDCR.  He has made no showing that his health deteriorated while he was at MCSP, and he has not submitted any reliable medical evidence to support his lay opinion that a reduced caloric and protein intake caused his headaches.

   There is no evidence that either Dr. Soltanian-Zadeh or Dr. Heatley ignored or disbelieved plaintiff when he said he was allergic to nuts and fish.  To the contrary, every indication is they took the information seriously and thoroughly assessed whether a special diet was necessary.  As detailed above, Dr. Heatley took plaintiff's specific physiology into account before he made the decision whether to provide a special diet.  He made a reasonable inquiry into the nutritional value of the food provided prisoners on a daily and weekly basis and concluded that even after plaintiff excluded fish and nut products, his average caloric and protein intake would be more than enough to maintain his current weight.  There is no dispute that under CDCR policy the primary care physician at MCSP had discretion to exercise his professional judgment

\\\\

in deciding whether to order a special, allergy-free diet for a particular inmate.[4]  In his opposition, plaintiff expresses his lay opinion that these defendants' medical judgment to deny him a substitute meal was a dereliction of their duties as physicians.  But his relatively well-informed disagreement with defendants' decision is not enough to hold them liable in the absence of any evidence of actual indifference or, more importantly, any harm.  See Toguchi, supra.

       Finally, plaintiff's inadvertent ingestion of a small amount of peanut butter and jelly ice cream cannot be a basis for proceeding to trial.  First of all, the privilege of a dessert in prison stands quite apart from the constitutional necessity of daily meals and adequate nutrition.  Having examined the nutritional composition of the meals at MCSP, defendants were under no obligation to alter or even address the prison's dessert menu.  Indeed, plaintiff asked for a special diet to supplement the relatively minor caloric and protein decrease caused by excluding nuts from his three daily meals; he did not ask for, nor would he have any constitutional claim to, special desserts.  Plaintiff failed to inquire whether the ice cream had any nut product in it, though his own testimony and medical history make it clear that he was fully aware of his allergy and capable of taking his own preventative measures.  In the end, it caused him no harm, in no small part because the defendants' response plan for just such an accident was in place.  Their plan demonstrates they were not indifferent to his food allergy.  In fact, in the one incident for which plaintiff seeks compensation, it can be said that defendants provided for successful treatment.

---

[4] Inexplicably, Dr. Heatley, who is represented by counsel, has not submitted a copy of the written policy that, according to him, directly informs a prison medical official how to respond to a request for a special diet due to a food allergy, nor is it at all clear who, in this instance, would have been the primary care physician charged with the decision whether to provide a special diet under that policy.  It is not unreasonable to suppose the primary care physician was Dr. Soltanian-Zadeh, since it appears he was the only doctor who directly interacted with plaintiff about his allergies.  If so, Dr. Soltanian-Zadeh's assertion that he had no authority to order a special diet would be false, according to the policy that Dr. Heatley consulted.  In any event, the fact that plaintiff cannot prove any adverse consequence to his health absolves both doctors of any potential liability.

There are no issues of material fact to support plaintiff's claim that defendants were deliberately indifferent to his food allergy.  There are no issues of material fact that defendants' denial of a special diet has caused plaintiff any harm.  There are no issues of material fact that plaintiff suffered any pain from the single incident of accidental ingestion of an allergen alleged in this case or that the incident could in any way be attributed to the defendants' actions as prison physicians.  For all of these reasons, summary judgment on plaintiff's claims for damages and injunctive relief[5] should be granted.

Accordingly, IT IS HEREBY ORDERED that:

1. Plaintiff's motion to extend discovery (Docket No. 25) is moot.

2. Defendants' motion to conduct plaintiff's deposition via video-conference (Docket No. 28) is moot.

IT IS RECOMMENDED that:

1. The motion for summary judgment (Docket No. 30) be granted.

2. Judgment be entered in favor of defendants Soltanian-Zadeh and Heatley and this case closed.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within twenty-one days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties.  Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations."  Any reply to the objections

---

[5] Even if there were material evidence sufficient to survive summary judgment, the claim for injunctive relief would be moot.  Shortly after he filed this lawsuit, plaintiff was transferred to Salinas Valley State Prison.  See Docket No. 8.  Generally, when a prisoner complains of unconstitutional conditions of confinement and is transferred to another facility, a claim for injunctive relief from those conditions becomes moot.  See Brady v. Smith, 656 F.2d 466, 468 (9th Cir.1981); Darring v. Kinchoe, 783 F.2d 874, 876 (9th Cir.1986); Johnson v. Moore, 948 F.2d 517, 519 (9th Cir.1990).  A plaintiff may avoid a finding of mootness if he can demonstrate a reasonable expectation of returning to the facility where the allegedly unconstitutional conditions persist.  Darring, 783 F.2d at 876.  Plaintiff has made no such showing here.

shall be served and filed within fourteen days after service of the objections.  The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order.  <u>Martinez v. Ylst</u>, 951 F.2d 1153 (9th Cir. 1991).

Dated: August 30, 2011

                                              _____
                                              CAROLYN K. DELANEY
                                              UNITED STATES MAGISTRATE JUDGE

3
doug3411.57